**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-4642

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

STEVE HALE,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Max O. Cogburn, Jr., District Judge. (3:13-cr-00280-MOC-DSC-1)

Argued: January 26, 2017                                Decided: May 15, 2017

Before WILKINSON, NIEMEYER, and KEENAN Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Wilkinson and Judge Keenan joined.

**ARGUED:** Marvin David Miller, LAW OFFICE OF MARVIN D. MILLER, Alexandria, Virginia, for Appellant. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Jill Westmoreland Rose, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

NIEMEYER, Circuit Judge:

Following a seven-day trial, a jury convicted Steven M. Hale of transporting stolen property in interstate commerce, knowing the goods to have been stolen; of conspiring to do the same; of making false statements in his tax returns; of failing to collect and pay employee taxes; and of obstructing justice. The district court sentenced him to 97 months' imprisonment.

Challenging his conviction on appeal, Hale contends primarily that the evidence was insufficient to justify the district court's decision to give the jury a willful blindness instruction and otherwise to support the jury's finding that he knew the property at issue was stolen. He also challenges the admission of certain evidence; the content of several jury instructions; the sufficiency of the evidence as to whether an individual who worked for him qualified as an employee, as opposed to an independent contractor; and certain statements that the government made to the jury during closing argument. Finding no reversible error, we affirm.

I

A federal grand jury returned a 31-count indictment in 2013 charging Hale with one count of conspiracy from at least 2006 through March 2011 to transport stolen property in interstate commerce, in violation of 18 U.S.C. § 371; twelve counts of transporting stolen property in interstate commerce, and aiding and abetting the same, in violation of 18 U.S.C. §§ 2314 and 2; three counts of making a false statement in his income tax returns, in violation of 26 U.S.C. § 7206(1); fourteen counts of failing to collect, account for, and pay

2

over federal taxes on an employee's wages, in violation of 26 U.S.C. § 7202; and one count of obstruction of justice, in violation of 18 U.S.C. § 1503. At the heart of the charged conduct was the government's allegation that, as part of an organized retail theft scheme, Hale served as "a Second-Level Fence engaged in the purchase and resale of stolen consumer products, goods and merchandise." Specifically, the government alleged that professional shoplifters — or "boosters," as they were called — had stolen millions of dollars worth of over-the-counter medications and health-and-beauty products from the shelves of retail stores and then sold the goods to first-level fences, who in turn sold the goods to Hale, the sole owner and operator of a warehouse in Denver, North Carolina, doing business as Double D Distributing, LLC. Hale profited, according to the government, by selling the stolen goods to at least one third-level fence.

The government's investigation began in the fall of 2010, when detectives with the Gastonia, North Carolina Police Department learned that heroin addicts in the area were routinely shoplifting large quantities of goods — particularly over-the-counter medications and health-and-beauty aids — from local stores and selling them to get money to buy heroin on a day-to-day basis. These boosters often operated in teams of two to four individuals and routinely stole $1,000 to $3,000 worth of merchandise in a matter of minutes. After some of the boosters identified a woman named Bonnie Bridges as their fence, officers set up surveillance that confirmed that numerous boosters were taking their shoplifted merchandise to Bridges' house on a daily basis. Officers then saw Bridges taking the merchandise to Hale's warehouse, which was a plain white metal building with no

3

identifying signs. Officers conducted further surveillance at the warehouse and eventually set up a pole camera across the street.

Between October 2010 and March 2011, their surveillance revealed that Bridges, often accompanied by her sister, regularly delivered stolen merchandise to the Double D warehouse. Bridges' two daughters and their husbands also made routine deliveries to the warehouse, as would a man named Darryl Brock. They all delivered their merchandise in plastic garbage bags, plastic storage bins, and boxes, and one officer who participated in the surveillance testified that he never saw anyone else, including any commercial trucks, make deliveries to the warehouse. On numerous occasions between October 2010 and March 2011, Hale was present at the warehouse when these individuals were paid cash for the stolen merchandise they delivered.

On October 20, 2010, investigating agents intercepted a FedEx shipment from the Double D warehouse to Jeff Telsey at JCA Enterprises in Boca Raton, Florida. In that shipment were items that the officers had marked with an ultraviolet-light pen prior to having a cooperating booster sell the items to Bridges. The shipment also contained merchandise marked with active security sensors and stickers identifying the retail store where the item was intended to be sold and a telephone number for people to call if the item was found elsewhere. This telephone number allowed people to find out if the product was stolen or if it was legitimately in the secondary market.

Investigating agents executed a search warrant at the Double D warehouse on March 24, 2011, where they found numerous shelves containing labeled boxes of merchandise and a "cleaning station" with different products used to remove stickers, sensors, and glue.

4

Sharon Cooke, who worked at the warehouse, was present at the beginning of the search and agreed to make two recorded telephone calls to Hale, who was in Florida at the time. She told Hale that the IRS "was around asking questions." During one of the calls, Hale responded, "Well, you don't know who we're doing business with," and then repeated, "You don't know who the business is with, do you?," even though Cooke did in fact know the identities of both the business' suppliers and customers.

On the same day that agents searched the Double D warehouse, they also searched Bridges' residence and arrested Bridges. After she was released from jail, she called Hale to accuse him of "throw[ing] us under the bus." Hale responded that he "hadn't done anything"; that Bridges and her family "shouldn't have done him the way that [they] did"; and that "he hoped [they] didn't turn on him." Moreover, the same day that officers searched Hale's warehouse, Hale called Brock, warning him that Bridges had gotten "arrested for a bunch of stolen merchandise"; "that the FBI was at his warehouse"; and that they would "probably be coming after [Brock] next." The next day, Hale advised Brock to "get rid of [his] product" and to take money out of his bank accounts before they were frozen by the police. Consistent with the latter piece of advice, Hale withdrew more than $236,000 from a joint bank account that he shared with his wife, redepositing the money in a new account in her name only.

One week after the search, on April 1, 2011, Hale listed his 26-foot boat for sale with a broker in Florida, asking more than $39,000. At some later point, however, Hale took the boat's title to a close family friend who was an auctioneer and signed the title over to his friend's company. The friend had the boat on his car lot for a few weeks but, at

Hale's request, moved it inside a building. Sometime after June 8, 2011, when a court issued a seizure warrant for the boat, Hale told his friend about the warrant and stated, "If anybody asks you any questions, it's your boat." Sometime later, Hale prepared a fraudulent promissory note reflecting that his friend had agreed to pay $18,000 for the boat, which they backdated to May 9, 2011.

Trial on the charges commenced in April 2014 and continued before a jury for seven days. In support of its case, the government introduced surveillance videos of activity outside of Hale's warehouse, the testimony from the investigating officers, and the testimony from several of Hale's alleged co-conspirators, including Bridges, Brock, Cooke, and Telsey.

Bridges testified that she met Hale in 2000 when she was selling over-the-counter medicines and health-and-beauty aids at a flea market after buying them directly from drug-addicted shoplifters. At that time, Hale approached her table and indicated that he might be interested in buying her products, particularly "Tylenol, Advil, [and] stuff like that." Thereafter, Hale gave Bridges a price list for the merchandise he wanted to buy and said he would pay cash for as much of that merchandise as she could deliver. For example, Hale would pay $4 for a 100-count bottle of Aleve, less than one-half the manufacturer's wholesale price of $8.61, and $6 for a 14-count package of Prilosec, substantially less than the wholesale price of $10.01. Hale told Bridges that he would not accept goods that were damaged or within one year of their expiration date. Based on Hale's price list, Bridges told the boosters what goods she wanted and how much she would pay for those goods, usually setting her price so that she made at least one dollar on each item. As to the

6

merchandise that Hale would not accept, Bridges sold it at flea markets, where she also continued to sell other miscellaneous items.

For the first five or six years that Bridges and Hale did business together, Hale would send someone to pick up the merchandise at Bridges' house. Eventually, however, Hale gave Bridges the address of his warehouse, and Bridges started delivering the stolen merchandise to the warehouse on an almost daily basis. Starting around 2004 or 2005, her daughters and their husbands found their own boosters to buy from in order to make money by reselling stolen merchandise to Hale.

At times, the drug-addicted shoplifters Bridges bought from would get arrested, and, when Hale or Cooke would ask her why she was not bringing in as much product, she would respond that her "people [were] on vacation." Bridges testified that Hale would not "ask any more questions about that." At no point during the decade that Bridges sold Hale stolen merchandise did Hale ever ask her for proof that the products she was selling to him were not stolen; nor did he ever ask about the retailer stickers, which were on at least 20% of the items that she sold to him.

Brock testified that he first met Hale in 2000, when his father introduced them. At the time, Brock and his father owned a fireworks store, but Brock was also buying over-the-counter medicine and health-and-beauty aids from drug-addicted boosters and selling the stolen merchandise at flea markets. Brock's father had previously sold stolen merchandise, and he told Brock that Hale "was okay and . . . was buying . . . the health and beauty aid stuff which [Brock] had." Hale subsequently provided Brock with a price sheet and started buying goods from him. In 2002, Brock was arrested after law enforcement

7

officers executed a search warrant on a trailer located behind his fireworks store and recovered counterfeit items and 20 boxes of stolen merchandise. While the charges were pending, Brock asked Hale if "he could help [him] out," and Hale gave Brock a fraudulent "receipt for 20 banana boxes and a bunch of receipts from a Walmart," leading police to drop the stolen property charge.

For several years after his arrest, Brock stopped dealing in stolen merchandise, but he got back into the business after meeting Bridges at a flea market in the spring of 2010. When he approached her booth, he could almost immediately tell, from "being in that business before," that her products were stolen goods. Brock started buying goods from Bridges regularly and eventually started selling some of those goods to Hale.

In late 2010, Hale and Brock had conversations about going into business together, with the idea that Brock would operate a warehouse in South Carolina. During these conversations, Hale told Brock that he made $18,000 in "a bad month" and that he was getting about 90% of his merchandise from Bridges and the members of her family. Hale advised Brock that he should always pay his suppliers in cash because he would "have to report it if [he] put it on the books," and he also told Brock to "make sure that [he] [got] everybody on tape saying that they don't deal in stolen merchandise," even giving Brock a voice recording pen device to be used for that purpose. He also gave Brock a device that could be used to detect if someone was wearing a wire.

Cooke testified that she first started working for Hale in 2001 when her sister-in-law, who was already working for him, needed help. Cooke and her sister-in-law worked together on a full-time basis until her sister-in-law left in 2006, and, from that point

8

forward, Cooke essentially ran the warehouse's daily operations, although Hale had an office there and was present about one-half the time. Bridges and the other suppliers called Cooke about an hour before they arrived at the warehouse with an estimate of how many items they were bringing, so that Bridges could go to the bank and withdraw cash from Hale's business account. Cooke then received the merchandise as it was delivered and paid the suppliers cash for it, often in the thousands of dollars. Cooke maintained a financial ledger of the transactions — on which Hale also made entries — that identified the suppliers, at first by codenames (such as "FW" for "fireworks," the codename for Brock, and "BG" for "Bonnie Gastonia," the codename for Bridges, who lived in Gastonia, North Carolina) and later by symbols (such as a star for one of Bridges' daughters and an asterisk for the other). After the suppliers left, Cooke — sometimes assisted by one of her family members — unpacked the merchandise, checked it for damage and shelf life, "cleaned" it of any retailer's stickers or sensors, and sorted it. Once the merchandise was cleaned and categorized, Cooke repackaged it and sent Hale a list of the inventory that was ready to ship. After Hale negotiated a deal with one of his purchasers, Cooke put the boxes of cleaned merchandise on pallets for shipping and prepared bills of lading.

Initially, Hale paid Cooke $500 in cash every two weeks for her work, but he eventually increased her pay to $20 in cash for every box of goods that she processed. Cooke withdrew cash from Hale's bank account to pay herself and also to buy all of the warehouse's supplies. While Cooke decided what hours to work, she nonetheless worked full time and exclusively for Hale for approximately a decade. With respect to Cooke's work, Hale reported having paid around $50,000 to "Sharon's Packaging" for each tax year

9

from 2006 through 2008, but he never issued Cooke either a W-2 or a 1099 tax form, nor did he withhold any of her income for taxes.

Jeff Telsey, who had been the owner and operator of JCA Enterprises, testified that he regularly bought stolen goods from Hale in order to resell them to retailers. When a shipment arrived from Hale, his operation inspected each item for damage, expiration dates, and stickers identifying the store where the item was supposed to be sold. He was concerned about such stickers — which he sometimes found on items in Hale's shipments — because any retailer receiving such products "would know that this was obviously stolen property." Telsey never called the phone numbers printed on the stickers because he already "knew [he] was dealing in stolen property." Telsey testified that he liked doing business with Hale because Hale sent him large quantities of the types of items that were the easiest for him to resell and Hale's prices were generally 10-15% lower than Telsey's other suppliers. When Telsey spoke with any of his suppliers, including Hale, they never used the word "stolen," but Telsey "took it for granted that everybody knew — had to know it was stolen" and that anyone with "half a brain in their head . . . would know it was stolen." Hale stopped selling to Telsey at some point in 2010, telling Cooke that Telsey was being investigated for dealing in counterfeit razor blades and indicating that, as a result, they would "probably be investigated for [dealing in] stolen product[s]."

Representatives from Bayer Health Care and Procter & Gamble — companies that manufactured some of the products at issue — testified that there was no legitimate way to buy their company's products for prices as low as the ones Hale charged. Similarly, the manager of CVS's organized retail crime unit testified that there was no lawful way for

"loose goods with different expiration dates from different stores with stickers on them" to come into the market.

After the government rested its case, Hale made a motion for a judgment of acquittal on all counts, and the district court denied the motion. Hale then presented testimony from several witnesses — some of whom testified about the existence of a legitimate secondary market in over-the-counter medicines and health-and-beauty aids. He then took the stand to testify in his own defense.

Immediately prior to that point, Hale's counsel requested that the court preclude the government from asking Hale about a prosecution that was brought against Hale and more than ten other defendants for conspiring during the period from 1992 to 1994 to transport or receive stolen goods — namely, over-the-counter drugs and health-and-beauty aids. On appeal of the convictions in that case, this court overturned most of the convictions, including Hale's, on the ground that the evidence did not support that the defendants had been willfully blind to the fact that they were dealing in stolen property. *See United States v. Ebert*, 178 F.3d 1287, 1999 WL 261590, at \*1 (4th Cir. May 3, 1999) (unpublished table decision). The government agreed not to ask Hale about these previous charges and the previous trial, but it argued that it should be able to cross-examine him about his business dealings at that time with Don Thomas, the first-level fence at the heart of that case. The court agreed, instructing the government to avoid referencing the fact that Hale was previously charged but ruling that "if he gained knowledge at that time and then . . . used that to be willfully blind in an effort to pull this off, then . . . that needs to come out." Hale's counsel agreed that such a question was "fair game."

11

Hale testified that he became involved in the secondary market business in 1992, when he bought $20,000 worth of merchandise at flea markets and gradually started identifying buyers. He stated that his business model involved dealing in "depressed product," meaning product that is "not in factory boxes" and does not "look factory new," and that he had "bought [product] from every known source that you can buy from." He testified that in his ten years of dealing with Bonnie Bridges, he had never heard "one word . . . spoken about her being a fence," adding that "nobody can run a booster operation ten years and deal with crackheads" without getting caught; that Bridges was "probably the [most] trusted buyer [he] had"; and that he "never ever thought she was selling stolen goods." He later added that he checked her criminal background and also verified that she was at flea markets when she said she was going to be.

On cross examination, Hale acknowledged that before he met Bridges, he had been involved in the secondary market; that one of the people from whom he had bought over-the-counter medicines and health-and-beauty aides was Don Thomas; and that he later learned that Thomas had been getting his goods from boosters and fences. He acknowledged that when he got back in the business in 2001, he knew that the presence of stolen property in the market was "a great risk." He also admitted that he had previously done business "with independent fences," but denied walking out of the room "whenever boosters would show up at those fences' places." In an attempt to refresh Hale's recollection, the government asked Hale to read silently from a document that was not identified for the jury but that was a copy of this court's unpublished opinion in *Ebert*.

12

After reading the passage, Hale maintained that somebody had falsely said that he had purposefully left the room when boosters were present.

At the conclusion of all the evidence, Hale renewed his motion for a judgment of acquittal, and the district court again denied the motion.

In its closing argument, the government referred to evidence indicating that the boosters who stole merchandise and sold it to Bridges were drug addicts, and it repeatedly emphasized, without objection, that most of the money that Hale paid Bridges ultimately went to the local drug dealers who were supplying the boosters with heroin and cocaine.

Before the district court instructed the jury, Hale objected to the court's decision to provide the jury with a willful blindness instruction. Hale's counsel allowed, however, that if the court was going to give such an instruction, "we don't have any problem with the proposed instruction of the court."

The jury found Hale guilty on all counts on April 22, 2014, and the district court sentenced Hale to 97 months' imprisonment. From the judgment entered against him dated October 13, 2015, as amended February 16, 2016, Hale filed this appeal.

II

For his main argument on appeal, Hale contends that the evidence was insufficient to support the district court's decision to provide the jury with a willful blindness instruction and otherwise to support the jury's finding that he knew the property was stolen. Hale also challenges the form of the willful blindness instruction that the court gave.

13

A

We begin with Hale's contention that the district court abused its discretion by instructing the jury on willful blindness in light of the evidence presented.

For a jury to convict Hale of transporting stolen goods in interstate commerce and conspiring to do so, the government was required to prove that Hale *knew* that the goods he was transporting were stolen. *See* 18 U.S.C. § 2314. While the government could, of course, meet its burden by proving that Hale *actually* knew the goods were stolen, it could also satisfy the knowledge element by presenting sufficient evidence that Hale had made himself *deliberately ignorant* of the fact that the goods were stolen, which evidence would justify the court's instructing the jury on "willful blindness." The first question before us, therefore, is whether the government presented sufficient evidence of Hale's deliberate ignorance to justify the district court's willful blindness instruction.

The principle that willful blindness will satisfy a knowledge element in criminal law is premised on the idea that defendants should not be permitted to "escape the reach" of criminal statutes that require proof that a defendant acted knowingly or willfully "by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011); *see also United States v. Jinwright*, 683 F.3d 471, 478 (4th Cir. 2012) ("To allow the most clever, inventive, and sophisticated wrongdoers to hide behind a constant and conscious purpose of avoiding knowledge of criminal misconduct would be an injustice in its own right"). But, to ensure that the willful blindness doctrine retains "an appropriately limited scope that surpasses recklessness and negligence," its application has

14

"two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances*, 563 U.S. at 769.

To be sure, "requests for willful blindness instructions should be handled with caution," *Jinwright*, 683 F.3d at 478, because of the risk that the instruction could mislead a jury into believing that it could convict the defendant for his mere negligence or recklessness with respect to a key fact making his conduct illegal, *see United States v. Lighty*, 616 F.3d 321, 378 (4th Cir. 2010). Nonetheless, it is appropriate to instruct the jury on willful blindness "when the defendant claims lack of guilty knowledge in the face of evidence supporting an inference of deliberate ignorance." *Id.* at 377–78; *see also United States v. Ali*, 735 F.3d 176, 187–88 (4th Cir. 2013).

In the record before us, there was ample evidence (both direct and circumstantial) from which to find first that Hale "subjectively believe[d] that there [was] a high probability" that the goods he was buying and selling were stolen. *Global-Tech Appliances*, 563 U.S. at 769. In his testimony at trial, he acknowledged that he knew from prior experience that there was a "very big risk" that people selling over-the-counter medicine and health-and-beauty aides at flea markets could be first-level fences who had bought the goods at deep discounts from professional shoplifters. The jury could also have found that Hale must have thought that it was highly likely that the only way that Bridges could be supplying him with trash bags and plastic storage bins full of assorted loose goods at prices well below wholesale on an almost daily basis was for her to be running a large-scale booster operation. Hale's subjective awareness was also indicated by the evidence

15

of his conduct in the aftermath of the search of his warehouse, when he attempted to coach Cooke into denying that she knew with whom he was doing business; told Bridges not to "turn on him"; and warned Brock to "get rid of [his] product" because the police would likely come after him next.

The record also contains ample evidence from which to find that Hale took deliberate actions to avoid confirming that the goods were in fact stolen. For example, the government showed that Hale was careful never to ask Bridges about who "her people" were or why so many of her goods were marked with stickers indicating that they belonged on the shelves of local stores. Instead, he had such stickers removed. Despite knowing from his earlier dealings of the "very big risk" that individuals selling these types of goods could be fences, he elected not to require his suppliers to ever provide receipts or other documentation showing that they were obtaining their goods through legitimate channels, and he structured his operation in a manner that minimized his direct contact with them.

In light of this and other evidence, we conclude that the district court did not abuse its discretion by providing the jury with a willful blindness instruction. *See United States v. Ruhe*, 191 F.3d 376, 384–85 (4th Cir. 1999) (holding that the district court did not abuse its discretion by giving a willful blindness instruction where the record included evidence that the defendant, charged with transporting stolen airplane parts, accepted the parts "without the normal documentation" and ignored that many of the parts were marked with red tags from the manufacturer indicating that they were "to be scrapped").

In addition to the evidence showing willful blindness to satisfy the knowledge element of the offense, the government also presented evidence that Hale *actually* knew

16

the goods in question were stolen.  For example, the government presented (1) testimony from Telsey that it was obvious that the merchandise he was purchasing from Hale was stolen; (2) evidence that Hale tried to disguise his suppliers' identities by instructing Cooke to use codenames and symbols in the company's financial ledger; and (3) testimony from Brock that when he and Hale were contemplating forming a partnership, Hale gave him a device to detect if someone was wearing a wire, as well as a voice recording pen devise that he could use to "get everybody on tape saying that they don't deal in stolen merchandise."

Whether by evidence of willful blindness or by evidence of actual knowledge, the government offered sufficient evidence from which the jury could find beyond a reasonable doubt that Hale knew that the goods in which he was dealing were stolen.

B

Hale also challenges the content of the willful blindness instruction that the district court gave, focusing in particular on a single sentence of the instruction in which the district court stated, "Willful blindness would only satisfy the knowledge element of these offenses if you, the jury, find the evidence supports an inference that the defendant was *subjectively* aware of the high probability that the goods he was buying were stolen goods, but purposefully avoided learning *the facts pointing to the fact* he was buying stolen goods." (Emphasis added for the challenged portions).  Hale contends that by "fail[ing] to define 'subjectively,'" the instruction allowed "the jury to conclude that 'subjective belief' could be proved based on facts that the defendant or a reasonable person should have known,

17

without consideration of facts actually known by the defendant." He also asserts that the instruction's "facts pointing to the fact" language impermissibly allowed the jury to find the knowledge element based upon "a circumstantial chain of events."

As a threshold matter, the government asserts that Hale waived any challenge to the content of the district court's willful blindness instruction, noting that after the district court provided the parties with a copy of the instruction, Hale's counsel approved of its form. In response, Hale asserts:

> Hale did not waive [an] objection to the content of the willful blindness instruction provided by the district court. He specifically objected to any willful blindness instruction at all. At most, when pressed by the court, Hale's counsel indicated that although he objected to the instruction proffered, if one has to be given then it was "not a bad one." He did not request or consent to any particular language in a willful blindness instruction.

The record, however, does not support Hale's position. After the court gave counsel a copy of the instruction that it intended to give to the jury, the following dialogue took place:

> Counsel for Hale: Your Honor, I can tell the Court, aside – obviously, our position is that we will object to the willful blindness instruction as we stated; but if the court is going to give one, *we don't have any problem with the proposed instruction of the court*.
>
> The Court: Okay.
>
> AUSA: The government has no objection, Your Honor. It accurately states the law.
>
> The Court: Then that's the one – then I will give that instruction.

(Emphasis added). Again, a day later during the trial, Hale's counsel reaffirmed his position:

The Court: The [instructions] to look at are the willful blindness one which I am going to give and I think we've already covered that one yesterday. The defense objects to any willful blindness; but if we had to give one, they don't think this one is a bad one. Is that right, Mr. Tin?

Counsel for Hale: That's our position Your Honor.

When counsel states affirmatively to the court that he has *no problem* with the form of the proposed instruction, he waives any objection he has to the form. Had Hale objected to the instruction's language when the district court specifically asked for his views, the court could have amended the instruction. But with the express reassurance that Hale had no problem as to the form, the court gave the instruction to the jury, reserving only Hale's objection to the fact that it was given at all. It is therefore clear that Hale waived any objection to the form of the willful blindness instruction.

Nonetheless, were we to consider Hale's newly asserted objection, we would readily conclude that the district court did not err in giving the form of willful blindness instruction that it gave to the jury. Indeed, much of the comprehensive instruction consisted of direct quotes from the Supreme Court's synthesis of the willful blindness doctrine in *Global-Tech Appliances* and our subsequent decision in *Jinwright*, where we upheld a willful blindness instruction as consistent with *Global-Tech Appliances*. *See Jinwright*, 683 F.3d at 479–80. We find no merit to Hale's complaint that the district court failed to define the word "subjectively," as the word is one of ordinary English and the context of its use clearly signaled to the jury that it was required to focus on whether Hale himself believed that the goods were likely stolen property. Moreover, the single "facts pointing to the fact" phrase, while not the most artful, did not render the instruction erroneous, especially when taken

19

as a whole. The district court repeatedly "emphasize[d] that the government must prove more than the defendant was reckless or negligent," taking care to correctly explain those terms. And it concluded its instruction by using key language from *Global-Tech Appliances* to explain that "[t]o find beyond a reasonable doubt the defendant was willfully blind, you first have to find the defendant subjectively believed there was a high probability that he was buying stolen goods and, two, that the defendant took deliberate actions to avoid learning the goods he was buying were stolen." Thus, even had Hale not waived his objection to the form of the instruction, we would conclude that the district court's willful blindness instruction, considered as a whole, "accurately and fairly state[d] the controlling law." *United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996).

III

Hale raises several other challenges, each of which merits only a brief discussion.

A

Hale challenges the district court's admission of three categories of evidence, none of which he objected to at trial. Because he failed to object, our review is limited to plain error. *See* Fed. R. Crim. P. 52(b).

*First*, Hale contends that "evidence that Bridges' boosters were drug addicted was not relevant" and, in any event, was more prejudicial than probative. He maintains that evidence regarding the boosters' "drug problems was an appeal to the emotions of the jurors," meant to "generate anger and bad feelings in the jurors against" him.

20

We conclude, however, that the district court did not err in admitting this evidence. That the boosters were desperate to feed very expensive drug habits was critical to explaining why there was a network of people willing to shoplift thousands of dollars' worth of merchandise and sell it quickly for very cheap prices. The boosters' drug addition was thus at the heart of how this retail theft scheme was able to function, and the district court did not abuse its discretion — let alone commit plain error — by admitting this type of evidence.

*Second*, Hale argues that the evidence relating to his prior acquittal for conspiracy to deal in stolen goods "was not relevant, was more prejudicial than probative[,] and was prohibited bad character evidence." He argues, "Whether Thomas or others previously sold stolen goods to Hale did not make any more or less probable the question of whether he knew Bridges, who had no connection whatsoever to them, also sold stolen goods to him." In addition, he complains that "the government used a bound Federal Court of Appeals reporter volume," thus showing the jury that there was "a case book with a case of the defendant in it." At bottom, according to Hale, "The entire line of questioning served only to inform the jury, impermissibly, that Hale had a prior case involving fences" and was therefore "propensity evidence" that should have been excluded under Federal Rule of Evidence 404(b).

Hale not only failed to object to this evidence when it was presented at trial, he expressly agreed that "we don't have a problem with" the government asking Hale on cross-examination whether, before he met Bridges, he had learned that one of his previous suppliers had been buying stolen goods from heroin addicts. Accordingly, we conclude

21

that he waived his objection. Moreover, contrary to his claims, there was no "bound Federal Court of Appeals reporter volume," as the *Ebert* decision was unpublished and not even reported in the Federal Appendix. Nothing in the government's questions or in its act of handing Hale a printed copy of the opinion to refresh his recollection informed the jury that there had previously been a case against Hale involving fences.

*Third* and finally, Hale challenges the admission of Brock's testimony that he understood from his father that Hale dealt in stolen goods, arguing that this evidence constituted hearsay and prohibited bad character evidence. But the only out-of-court statement admitted was Brock's testimony that he first learned of Hale when his father told him that Hale "was okay and . . . was buying HBA, which is the health and beauty aid stuff which I had." Brock added that he understood his father's statement to mean "[t]hat you could deal with him as far as on that level" — *i.e.*, the stolen-merchandise level — and that he generally trusted Hale because his father "was the intro." The out-of-court statement by Brock's father that Hale was "okay" was thus properly admitted not for the truth of the matter asserted but to show why Brock thought he could sell stolen goods to Hale. Accordingly, there is simply no basis for Hale to argue that the district court was required, *sua sponte*, to exclude this brief explanation by Brock as to his own state of mind.

B

Hale also challenges the form of two other instructions given to the jury, although he did not object to them at trial. Our review of these challenges, therefore, is again limited to plain error.

22

Hale contends first that the district court committed reversible error by instructing the jury to give special scrutiny to Hale's testimony, arguing that he was "prejudiced by the court's directive to scrutinize his testimony beyond other interested witnesses because the court implied [his] testimony was false." But, as the government notes, the district court's instruction below did no more than equate Hale with any other interested witness. Specifically, the court instructed the jury first that "[i]f you find a witness is interested in your verdict, it is your duty to scrutinize his or her testimony closely. But after you have done so, and if you find he or she is telling the truth in whole or in part, you will give that testimony the same weight you would of a disinterested witness." It then explained further:

> The defendant Steve Hale took the witness stand and testified on his own behalf. Defendants are interested witnesses. You will scrutinize his evidence in the light of his interest that he has in the case. If after scrutinizing the testimony, you find he has told the truth, you should give his testimony the same weight as the other witnesses in the case.

Contrary to Hale's argument, the district court did not "impl[y] [that] Hale's testimony was inherently unbelievable" but simply noted that defendants who testify on their own behalf, like Hale, are interested witnesses whose testimony should be scrutinized like any other interested witness. This instruction did not constitute plain error.

Hale also contends that the district court erred in instructing the jury on conspiracy law. We conclude, however, that the court accurately instructed the jury that, "once a conspiracy is established, even a slight connection between the defendant and the conspiracy could be sufficient to include him in the plan." *See United States v. Strickland*, 245 F.3d 368, 385 (4th Cir. 2001) ("Once a conspiracy has been proved, the evidence need only establish a slight connection between any given defendant and the conspiracy to

support conviction"). Hale nonetheless contends that because the district court "did not also tell the jury that the 'slight connection' had to be proved beyond a reasonable doubt," the "jury could have easily believed that the connection element for the conspiracy charged could be proved through just slight evidence of a connection." This argument, however, overlooks the fact that the district court repeatedly made clear throughout its instructions that the government had to prove each element beyond a reasonable doubt.

We find no error in the district court's giving these instructions.

C

Hale next contends that the government failed to present sufficient evidence to allow the jury to find beyond a reasonable doubt that Cooke was his employee, as opposed to an independent contractor, as necessary for his convictions on 14 counts of failing to collect and pay over employee taxes, in violation of 26 U.S.C. § 7202. Hale focuses in particular on evidence (1) that Cooke testified that she was 'self-employed'; (2) that she had "sole discretion over when and how long she worked"; (3) that Hale paid Cooke by the box; and (4) that Cooke exercised considerable discretion, including whether to hire additional assistants. While the jury might have been able to find from this evidence that Cooke was an independent contractor, Hale overlooks the ample evidence supporting the jury's finding that she was an employee for purposes of the tax reporting requirements. This additional evidence showed that Cooke worked *exclusively* and *full time* at Hale's warehouse for approximately a decade using equipment that Hale supplied and following Hale's directions to complete tasks that were essential to the operation of his business. With such

24

evidence, we have no difficulty concluding that the jury's finding that Cooke qualified as an employee of Hale's business was supported by substantial evidence.

D

Finally, Hale contends that the prosecutor engaged in misconduct during his closing argument, denying Hale his right to a fair trial. Specifically, he contends that the government's closing argument "focused on how Hale denigrated the community by feeding individuals' addiction," indirectly lining the pockets of area drug dealers "while living an opulent lifestyle elsewhere." Hale argues that this "blatant appeal to passions and prejudices was improper" and "deprive[d] him of a fair trial."

Again, because Hale did not object to the argument at trial, our review is limited by the plain error standard, and we readily conclude that the district court did not plainly err by failing, *sua sponte*, to issue a curative instruction or to declare a mistrial upon hearing the government's closing argument. The prosecutor's statements that Hale reaped profits by engaging in conduct that had the effect of fueling illicit drug trafficking was an accurate summary of the evidence, not prosecutorial misconduct. And, in any event, in light of the strength of the government's case, the remarks certainly did not so prejudice Hale's substantial rights that he was denied a fair trial.

\* \* \*

Accordingly, we affirm the judgment of the district court.

AFFIRMED