[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12999
Non-Argument Calendar
_____

D.C. Docket No. 5:14-cv-00684-MHH

JUDSON A. LOVINGOOD,

Plaintiff-Appellant,

versus

DISCOVERY COMMUNICATIONS, INC.,
SCIENCE CHANNEL, THE,
DISCOVERY CHANNEL, THE,
BBC FILMS,
KATE GARTSIDE,

Defendants-Appellees,

OPEN UNIVERSITY, THE,

Defendant,

DISCOVERY COMMUNICATIONS, LLC,

Interested Party-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(February 7, 2020)

Before WILSON, BRANCH, and JULIE CARNES, Circuit Judges.

PER CURIAM:

More than thirty years after the seven *Challenger* astronauts "'slipped the surly bonds of Earth' to 'touch the face of God,'"[1] a former NASA manager seeks $14 million in damages after he was depicted in a made-for-TV movie about the *Challenger* investigation. Because we decline to carve out an exception to well-established defamation law for this claim, and because the plaintiff has failed to overcome the broadcaster's First Amendment rights in the film, we affirm the district court's grant of summary judgment against him.

**I**

The space shuttle *Challenger* broke apart 73 seconds after it launched on January 28, 1986, killing all seven astronauts on board. A presidential commission was convened to investigate the cause of the disaster and recommend corrective action. The commission's investigation, which included televised public hearings,

---

[1] President Ronald W. Reagan, Address to the Nation (Jan. 28, 1986) (quoting John Gillespie Magee, Jr., "High Flight," *in Respectfully Quoted: A Dictionary of Quotations Requested from the Congressional Research Service* 117 (1989)).

2

would reveal that the disaster was caused by a rubber O-ring that, because of low ambient air temperatures at the time of launch, failed to seal a joint in the shuttle's solid-fuel rocket booster. More fundamentally, the investigation highlighted problems with risk assessment and decision-making at NASA, particularly after it emerged that outside contractors had recommended delaying the shuttle launch due to concerns about the effect of the cold weather on the rocket booster seals.

In 2012, the British Broadcasting Corporation ("BBC"), Discovery Communications, Inc. ("Discovery"), and The Open University co-produced a made-for-TV film about the *Challenger* investigation titled *The Challenger Disaster*. The film centers on Richard Feynman, Ph.D., the well-known Nobel laureate physicist who served on the presidential commission. Although the film uses some historical video footage, most of the film involves actors portraying the people and events of the *Challenger* investigation, and the film is shot in a dramatic, rather than documentary, style.

The film was based in part on Feynman's posthumously published memoir, *"What Do* You *Care What Other People Think?": Further Adventures of a Curious Character*, and in part on the book *Truth, Lies, and O-Rings* by space shuttle engineer Allan McDonald. The film was executive produced, researched, and written in the United Kingdom by the BBC, and it was filmed in South Africa in late 2012. The BBC broadcast the film in the United Kingdom in March 2013.

3

Discovery had a master agreement with the BBC that granted Discovery the option to co-produce and rebroadcast BBC programming in the United States, though the BBC would retain final artistic and editorial control over the programming. Discovery had contributed 40% of the production cost of *The Challenger Disaster* and received the license to rebroadcast the film in the United States. It rebroadcast the film, very slightly modified, on the Discovery Channel and the Science Channel on November 16, 2013.

The film opens with historical video and audio from the moments before *Challenger*'s launch, with the following title cards interspersed:

"This is a true story."

"It is based on the book 'What Do You Care What Other People Think?' by Richard and Gweneth Feynman and Ralph Leighton and on interviews with key individuals."

"Some scenes have been created for dramatic purposes."

The plaintiff–appellant, Judson Lovingood, Ph.D., was the deputy manager of the space shuttle projects office at NASA's Marshall Space Flight Center in 1986. In the film, he appears in one short scene near the end. In that pivotal scene, Lovingood and two other NASA managers testify in the commission's televised hearing after being sworn. One of the managers is reciting dry, technical information when Feynman, visibly dismayed that they are getting nowhere,

4

interjects.[2] "I have a question. Can you remind me what NASA calculates the probability of shuttle failure to be? Failure meaning the loss of the vehicle and the deaths of the entire crew."

Another commission member directs the question. "Dr. Lovingood?"

"Certainly. Uh, that would be—one in ten to the power of five," Lovingood calmly replies.

"Really," Feynman says, incredulous. "Would you explain that?"

"Yes, that the probability of mission success is one hundred percent. Minus epsilon."

"Epsilon, that's a pretty fancy word," muses Feynman. "Well, let's put all that you've said there into English. So that's, um, that's one failure in every 100,000 flights. So you claim that the shuttle would fly every day for 300 years before there would be a single failure. That's crazy, I mean, how would you ever even test that?"

"NASA arrived at that figure because it was a manned flight," Lovingood explains.

"Because there were people on board. But that's not a scientific calculation; that's—that's—a wish." Feynman is picking up steam now. "And interesting that the figure is very different from that of NASA's own engineers. Based on their

---

[2] This and other transcriptions of the U.S.-aired copy of the film in the record are our own.

direct experience and observation of many known component problems, some of NASA's engineers calculate the probability of *success* as only 99.4 percent. In other words, that's roughly one flight in every 200 will fail." The room dissolves into murmurs as Feynman unfolds a handwritten note that reads "We Think Ivory Soap (99.4%)."

Following this scene, other characters congratulate Feynman on revealing NASA's errors in judgment and risk assessment. Feynman then performs for the television cameras his famous demonstration of ice water rendering an O-ring inelastic, which serves as the film's climax as Feynman finally reveals to the nation the truth about what caused the *Challenger* disaster.

Undisputedly, Lovingood's testimony scene is a fictionalization. Although Lovingood twice testified before the commission, his testimony covered only technical background on the shuttle's propulsion systems and their preflight testing and discussed the conference calls that took place the day before launch.  That testimony was not depicted in the film. The discrepancies in failure probabilities at NASA were not the subject of commission testimony, instead appearing in Feynman's Appendix F ("Personal Observations on the Reliability of the Shuttle") to the commission's final report.

Feynman learned the 1-in-200 and $1\text{-in-}10^5$ figures in two different meetings that he conducted at the Marshall Space Flight Center in Huntsville. According to

6

Feynman's memoir, NASA range safety officer Louis Ullian told him that NASA had given him a probability of space shuttle failure of 1 in $10^5$, prompting Feynman's response of "crazy!" and his observation that the shuttle could undertake a flight every day for 300 years between accidents. On another occasion, Feynman recounted meeting with three NASA engineers and their boss, Lovingood.[3] Feynman asked them each to write down "the probability that a flight would be uncompleted due to a failure in this [main] engine." One engineer wrote "99-$^{44}/_{100}$% pure," one wrote something amounting to 1 in 200, and one wrote "1 in 300." Lovingood wrote, "Cannot quantify." When Feynman accused him of weaseling, Lovingood clarified that he meant "100 percent . . . minus epsilon," with epsilon being $10^{-5}$. Lovingood later sent Feynman the NASA report about failure probabilities for launches of plutonium-powered space probes, which had calculated the 1-in-100,000 odds that Feynman found fantastical.

The film dramatizes that second meeting early on, but with Lovingood absent from the scene. Feynman sits down to a meal in the Marshall cafeteria and asks two NASA engineers sitting nearby the probability of "an accident on any single launch." The engineers are reluctant to reply out loud and Feynman suggests that they write their response on a piece of paper, but we do not see either engineer

---

[3] In his 2016 deposition, Lovingood noted that Feynman's recollection of this meeting was so good that he thought he must have had a tape recorder, although he disputed that he ever said "100 percent."

doing so.  We see Feynman contemplating the "We Think Ivory Soap" note in two mid-film scenes; we don't know where it came from, and Feynman doesn't know what it means.  Later, when Mrs. Feynman sees the note and absentmindedly misrecites the old Ivory Soap slogan as "99.4% pure," Feynman makes the connection.  As the testimony scene finally confirms, the engineers in the Marshall cafeteria were the source of Feynman's climactic 99.4% figure.

## II

Lovingood filed this suit against Discovery Communications, Inc., the Science Channel, the Discovery Channel, BBC Films, the Open University, screenwriter Kate Gartside, and several unnamed defendants in Alabama state court in 2014, alleging defamation and invasion of privacy–false light stemming from his negative portrayal in the film.  He sought $7 million in compensatory damages and $7 million in punitive damages, invoking the memory of the seven deceased *Challenger* astronauts. Compl. ¶ 11.  Discovery removed to federal court; several defendants were dismissed; and Discovery eventually moved for summary judgment.

In 2017, the district court granted summary judgment against both of Lovingood's claims and dismissed his complaint with prejudice. *Lovingood v. Discovery Comm'ns, Inc.*, 275 F. Supp. 3d 1301 (N.D. Ala. 2017).  On the defamation claim, the court found that Lovingood was a public official, *id.* at 1309,

8

and that he failed to show that Discovery acted with actual malice, *id.* at 1314. On the invasion of privacy claim, the court found that Lovingood similarly failed to show that Discovery acted recklessly. *Id.* Lovingood now appeals the grant of summary judgment against his defamation claim.

## III

We review the district court's grant of summary judgment de novo "and will affirm if the evidence, 'viewed in the light most favorable to the nonmoving party, presents no genuine issue of fact and compels judgment as a matter of law.'" *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1153 (11th Cir. 2011) (quoting *Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046, 1050 (11th Cir. 2008)).

Alabama law generally allows a plaintiff to recover damages for defamation against a publisher who negligently publishes a false and defamatory statement about the plaintiff. *See Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, 1091 (Ala. 1988).[4] However, the Supreme Court has explained that the First Amendment's protections of the right to criticize the government operate to limit state defamation law when the plaintiff is a "public official." A plaintiff who is a "public official" must overcome the First Amendment by proving that a false

---

[4] According to the Restatement (Second) of Torts, upon which the Alabama Supreme Court relied in *Nelson*, a defendant who merely republishes the work of another can be every bit as liable as the original publisher. Restatement (Second) of Torts § 578 (1977); *see also Age-Herald Publ'g Co. v. Waterman*, 66 So. 16, 21 (Ala. 1913).

statement relating to his official conduct "was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964).[5]

Initially, Lovingood briefly disputes the finding of the district court that he is a "public official" for purposes of this First Amendment analysis. He asserts in passing that he was merely a "public employee," without addressing the detailed analysis of the district court on that issue.[6]  We affirm the conclusion of the district court that Lovingood is a public official for purposes of this litigation. "[T]he 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). We agree with the district court that serving as a NASA deputy manager with substantial responsibility for the shuttle's propulsion systems amounted to control over the conduct of governmental affairs.

We also note that NASA held out Lovingood as a public official when it asked him to testify about the shuttle before the presidential commission. In his

---

[5] "Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991).

[6] In accordance with his main argument—discussed below—that we should disregard settled case law in this area, Lovingood argues that his allegations should be considered libel *per se*, regardless of whether he is a public official.

10

2016 deposition, Lovingood explained that he was chosen because Marshall considered him to be the "'corporate memory' about the space shuttle" and "the person who knew the most about the space shuttle, all three elements."  Apart from contemporary press coverage of the *Challenger* investigation, the record also contains many news articles from the 1980s in which Lovingood was quoted by local and national media as an authoritative source about the space shuttle program.  Lovingood also continued to hold himself out as one with substantial responsibility for government affairs following his retirement from NASA. He has continued to give retrospective interviews about *Challenger* and appeared in two separate television documentaries about the disaster.  For purposes of the First Amendment's protection of speech about the *Challenger* tragedy, then, Lovingood was a public official.

With that threshold question resolved, we turn to Lovingood's main contention on appeal. Lovingood invites us to create an exception to the well-established *New York Times* standard for situations involving the fictionalization of sworn testimony. He urges us, in view of the sanctity of the testimonial oath and its centrality to our legal system, to find that the "actual malice" standard articulated by the Supreme Court does not apply in the context of depictions of perjury.

We are not free to accept Lovingood's invitation. As the Supreme Court has instructed, "If a precedent of this Court has direct application in a case . . . the

Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). And indeed, that Court has steadfastly refused to create new exceptions in defamation law for the last fifty years. *See, e.g.*, *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991) (declining to create an exception for inaccurate quotations); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990) (declining "to create a wholesale defamation exemption" for opinions).

The *Masson* decision in particular merits closer examination, for Lovingood relies heavily upon it. The case involved a journalistic magazine article that printed quotations attributed to the plaintiff that undisputedly differed from his audiorecorded interviews with the author. *Masson*, 501 U.S. at 501–08. The Court held that some of the alterations were evidence of falsity for purposes of the *New York Times* standard because they "result[ed] in a material change in the meaning conveyed by the statement." *Id.* at 517. In so holding, the Court explained that the appropriate inquiry when examining possibly defamatory quotations is an objective one: would a reader "reasonably understand the quotations to indicate reproduction of a conversation that took place"? *Id.* at 512.

Significantly for our purposes here, the Court explained that, in some contexts, the answer to that question is *no*. "In other instances, an acknowledgment

that the work is so-called docudrama or historical fiction . . . might indicate that the quotations should not be interpreted as the actual statements of the speaker to whom they are attributed." *Id.* at 512–13. Thus, our "actual malice" inquiry must take into account how a reasonable viewer would understand the contents of the scene. We acknowledge that there is some dispute over how this film's genre should be formally characterized. Discovery's corporate representative described it as a docudrama or a historical drama but distanced himself from a Science Channel press release's label of "fictional drama."  But the perspective of the reasonable viewer encompasses more than a one- or two-word label; it looks to the film itself. Within the film, Discovery emphasizes the last of the three title cards displayed in the first minute of the film: "Some scenes have been created for dramatic purposes." Lovingood, by contrast, emphasizes the first of those title cards: "This is a true story."[7]

We find most telling, however, the overall format, tone, and direction of the film. A reasonable viewer would understand within the first two minutes that he is not watching a documentary film that consists mainly of historical footage and interviews with the historical figures. He would recognize the parts of the film that

[7] In Lovingood's complaint, he reprints this text in all capitals ("THIS IS A TRUE STORY"), and it may have appeared that way in the BBC-broadcast version of the film shown in the United Kingdom. In the Discovery-broadcast version shown in the United States, which is the only version at issue in this appeal, the title text appears in upper- and lowercase as we have transcribed it.

13

do use historical footage and understand that they are meant to depict literal history, and he would understand that most of the film uses actors to portray historical events with some amount of artistic license. He would also understand that condensing the entire *Challenger* investigation into a 90-minute dramatic film required the selective editing of real history not only for time but also for clarity, flow, and emotional impact. Finally, and most importantly, he would understand that the film presents the *Challenger* story not as a disinterested, objective narrative but through a single critical perspective—that of Feynman, who is sympathetically portrayed by a recognizable actor and who appears in nearly every scene. Overall, a reasonable viewer would understand the film as generally not purporting to present verbatim dialogue from the pages of history.

Thus, as we determine whether Discovery acted with actual malice when it republished the Lovingood scene, the mere fact that the film contains altered historical dialogue is not, in itself, evidence that Discovery made statements with knowledge that they were false, for purposes of the *New York Times* standard. We will not apply a novel libel-per-se rule for depictions of sworn testimony, nor are we invoking an invincible shield of protection for all works characterized as docudrama or historical fiction. Rather, we will apply the actual malice standard that the Supreme Court first articulated in *New York Times* and has applied for more than fifty years, as did the district court.

But before we may determine whether the "defamatory falsehood relating to his official conduct . . . was made with 'actual malice,'" *N.Y. Times*, 376 U.S. at 279–80, we pause to identify what, exactly, is the defamatory falsehood about Lovingood that Discovery is alleged to have republished. According to the complaint, it is "that Lovingood had lied about the probability of *total failure* being 1 in 100,000 when NASA's own engineers had said it was 1 in 200." Compl. ¶ 7. In other words, Lovingood argues, the film falsely depicts him committing the crime of perjury.

Discovery insists that the scene does not depict perjury because nothing in the film suggests that Lovingood's character lied or deliberately misled the committee while under oath.  With this characterization we agree. Although the entire film, through Feynman's dialogue and demeanor, is critical of NASA's management and decision-making in general and the $10^{-5}$ figure in particular, the film does not paint Lovingood as a liar. Nor does it imply any intent to mislead; the Lovingood character's demeanor as a witness is calm, direct, and frank. And Feynman responds to Lovingood's testimony not with an accusation or even a suggestion that he lied about NASA's calculation, but instead with incredulity regarding the calculation itself.

Of course, Lovingood admits that he did in fact report NASA's 1-in-100,000 figure to Feynman in a private meeting at Marshall. His objection is that the film

15

changed the context of that $10^{-5}$ figure from "the probability that a flight would be uncompleted due to a failure in this [main] engine" to the probability of "the loss of the vehicle and the deaths of the entire crew." He asserts that those are two very different situations given the possibility of aborting a launch and saving the crew in the event of a main engine failure.  He argues that this alteration means that, because NASA never actually calculated the probability of the deaths of the entire crew as $10^{-5}$, his character necessarily committed perjury when he answered the commission's question about crew deaths.[8]  The problem with this argument, though, is that a viewer of the film does not know what NASA did or did not actually calculate. Without any basis for believing the calculation to be false, the reasonable viewer would not perceive this scene as depicting perjury.

Nonetheless, Lovingood's broader point about altering the meaning of the $10^{-5}$ figure has merit. Discovery responds by downplaying the significance of conflating the failure of the main engine with the deaths of the entire crew. It notes that, under NASA's own criticality assessment, main engine failure was classified as causing catastrophic loss of life or vehicle.  And even Feynman seems to conflate or equate these two situations in his Appendix F to the commission's

---

[8] Lovingood also objects to the film's moving the $10^{-5}$ discussion to his character's sworn committee testimony, arguing that sworn testimony should be sacrosanct and must never be altered from historical reality.  We have already rejected this argument about the sanctity of the testimonial oath, declining to make a new per se rule that would put dramatic depictions of sworn testimony outside the reach of the First Amendment.

16

report.  Nonetheless, for purposes of our summary judgment review, we view the record in the light most favorable to Lovingood and assume that there is a meaningful difference between what he actually told Feynman in reality and what his character testified in the film.[9]

Thus, we will assume that Lovingood has alleged that a false and defamatory statement was republished by Discovery. As a public official speaking on a matter of public concern, then, Lovingood must show that Discovery acted with knowledge that the statements about him were false, or with reckless disregard for whether they were false. *N.Y. Times*, 376 U.S. at 279–80. We consider each of these bases for liability in turn.

The first basis is straightforward. The record contains no evidence at all that Discovery knew that the lines spoken by the Lovingood character in the film were

---

[9] Of course, "[t]ruth is an absolute defense to defamation," *Liberty Loan Corp. of Gadsden v. Mizell*, 410 So. 2d 45, 49 (Ala. 1982), and Discovery also argues that the scene was "substantially true" and not defamatory because it was constructed from accurate historical sources. *See Masson*, 501 U.S. at 516 (defamation law "concentrates upon substantial truth"). But we will assume for the purposes of our review that Lovingood has alleged enough of a departure from the historical record to get him to the next step of our analysis.

We do not, however, endorse Lovingood's out-of-context quotation of the Supreme Court's observation that "there is no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974).  Importantly, the Court went on: "Although the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate." *Id.* Thus, in order to avoid the chilling of valuable speech, "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters." *Id.* at 341. It is in view of this tension between truth and liberty that the Supreme Court in *New York Times* articulated the "actual malice" standard for falsehoods involving public officials, and it is that test that we here apply.

17

false. This situation is not like *Masson*, where the journalist herself conducted and tape-recorded interviews with the plaintiff that she later quoted in her article. *Cf.* 501 U.S. at 502. The BBC writer here, by contrast, relied on 25-year-old historical materials, including the commission's hearing transcripts and Feynman's book, when she wrote the film's screenplay. Lovingood himself concedes that Discovery's executive producer on the film, Rocky Collins, realized only years after the film was broadcast that there was a "discrepancy" between the book's and the film's characterization of the $10^{-5}$ probability. The "actual knowledge" basis for actual malice therefore fails.

Lovingood argues instead that Discovery acted with reckless disregard for whether the statements about him were false. He insists that Collins should have read the hearing transcripts and Feynman's book more closely and that he should have been more aggressive in his pursuit of the BBC's research notes. To be sure, we acknowledge that the record contains some discrepancies about what Discovery subjectively believed its responsibility was for fact-checking the script of *The Challenger Disaster*. Discovery's corporate representative repeatedly asserted that the BBC had sole responsibility for fact-checking and avoiding defamation because it actually produced the film. Under its master agreement with Discovery, the BBC had warranted that "no Co-Produced Programme will defame any individual or entity" and that "all statements of fact contained in each Co-Produced

18

Programme shall, to the best of BBCW's knowledge and belief having undertaken diligent research in keeping with generally accepted standards for first class documentary film makers, be true and accurate." Collins testified, however, that, although he mainly relied on the BBC to get the facts right, his job "was to make sure that they [were] doing it." He admitted, though, that he personally only skimmed Feynman's book. Because we view the record in the light most favorable to Lovingood, we will assume for purposes of our review that Discovery retained some responsibility for fact-checking the film.

But even if we accept Lovingood's view of what fact-checking Discovery should reasonably have done, the standard for reckless disregard is still higher. "[F]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." *Harte-Hanks Comm'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989). Because actual malice is not an objective standard, arguments about what a reasonable producer should have done will not avail. Rather, to show reckless disregard that amounts to actual malice, a defamation plaintiff must point to evidence that the defendant had real, subjective suspicions about the veracity of the statement in question. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), or that he acted with a "high degree of

awareness of . . . probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). Lovingood has identified no such evidence showing that anyone at Discovery had actual doubts about the scene or real awareness that the scene might be problematic. To the contrary, the sole Discovery employee who purported to have even a modicum of responsibility for the content of the film affirmed his complete satisfaction with the BBC's fact-checking. "Every time I had any question, they gave me satisfactory answers. Every time I said what—have you had lawyers look at this, yes. Every single—I had absolutely no reason to believe that they did not do their job. . . . I had no reason to—to suspect that they weren't doing their job."

Instead of pointing to evidence of reckless disregard, then, Lovingood argues that Discovery should be liable because it was willfully blind to the falseness of the scene. "The doctrine of willful blindness," which provides culpability equivalent to actual knowledge, "is well established in criminal law." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). But neither the Supreme Court nor our Circuit has ever applied that doctrine in the civil context of defamation, and Lovingood cites no case doing so. *Cf. Hard Rock Cafe Licensing Corp. v. Concession Servs.*, 955 F.2d 1143, 1149 (7th Cir. 1992) (equating willful blindness with actual knowledge for purposes of Lanham Act trademark violations). We need not decide, however, whether to do so here because Lovingood has presented no evidence that Discovery acted with willful

20

blindness to the falsity of the statements. Willful blindness is an even higher standard than recklessness, involving "deliberate actions to avoid confirming a high probability of wrongdoing" and nearly amounting to "actually know[ing] the critical facts." *Global-Tech*, 563 U.S. at 769. If Lovingood cannot point to evidence of recklessness as actual malice, he necessarily cannot establish willful blindness.

Thus, we conclude that Lovingood has not established a genuine issue of material fact about whether Discovery acted with actual malice. Discovery is therefore entitled to the protection of the First Amendment, and the district court's grant of summary judgment in favor of Discovery is

**AFFIRMED.**

21