# United States Court of Appeals
### For the Eighth Circuit

_____

No. 23-3594
_____

United States of America

*Plaintiff - Appellee*

v.

Edwin Giovanni Salinas

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Northern

_____

Submitted: October 21, 2024
Filed: March 28, 2025

_____

Before LOKEN, SMITH, and GRASZ, Circuit Judges.

_____

SMITH, Circuit Judge.

Edwin Giovanni Salinas appeals the district court's imposition of a life sentence after a jury found him guilty of conspiracy to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1). He argues that the district court procedurally erred in applying a two-level enhancement under U.S.S.G. § 2D1.1(b)(13) and varying upward to a life sentence. Additionally, he

asserts that his life sentence is substantively unreasonable. We affirm the district court's imposition of the § 2D1.1(b)(13) enhancement. But we hold that the district court procedurally erred by basing its sentence on clearly erroneous facts not supported by the record. Accordingly, we vacate Salinas's life sentence and remand for resentencing.

## I. *Background*

Very early one morning, Roberts County Deputy Sheriff Dylan Pfeilsticker and Sisseton-Wahpeton Tribal Police Officer Malcom Edgar patrolled the Lake Traverse Reservation of the Sisseton-Wahpeton Oyate Sioux Tribe in northeastern South Dakota. Around 4:05 a.m., the officers stopped a suspicious vehicle on tribal land driven by Berta Rosmelvi Gonzales. Salinas was a passenger. Gonzales initially provided the officers with false identifying information. Eventually, however, she provided the officers with her true identity. The officers arrested Gonzales for impersonation to deceive law enforcement.

After securing Gonzales in their patrol vehicle, the officers returned to the stopped vehicle and observed Salinas throwing items inside the vehicle. Deputy Pfeilsticker instructed Salinas to exit the vehicle; Salinas responded by grabbing items and attempting to take them with him. Officer Edgar then directed Salinas to leave the items in the vehicle. The officers learned that Salinas had a revoked driver's license and could not lawfully operate the vehicle. They detained him in the patrol vehicle and called a tow truck.

Prior to the tow truck's arrival, the officers conducted an inventory search of the vehicle. Inside Gonzales's purse, Deputy Pfeilsticker found about one-half gram of methamphetamine. Additionally, Officer Edgar located a blue camouflage backpack containing 12 packages under a false floor in the vehicle's trunk space. Two of the packages, which were wrapped in clear plastic packaging material, contained a white powdery substance. The other ten packages were wrapped in brown and clear

packaging materials. The officers placed Salinas and Gonzales under arrest for drug-related offenses.

The 12 packages were field tested and found presumptively positive for fentanyl. Subsequently, the South Dakota Public Health Laboratory reported that the two packages containing the white powdery substance contained 1,490.96 grams of a substance containing fentanyl. The other ten packages contained 49,607 pills that were marked "M-30" and were composed of fentanyl and 4-anilino-N-phenethylpiperidine (4-ANPP), both controlled substances under federal law. The estimated street value of all packages exceeded $2,000,000.

Salinas and Gonzales were charged with conspiracy to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1). A jury found Salinas guilty on both counts.

At sentencing, the district court began by calculating a base offense level of 34 based on the fentanyl's weight. Pursuant to U.S.S.G. § 2D1.1(b)(13), the district court then applied a two-level special offense characteristic because Salinas "was trafficking counterfeit M-30 fentanyl pills that resembled oxycodone." R. Doc. 192, at 8. He acted with "willful blindness . . . , or conscious avoidance of knowledge, that such mixture or substance was not the legitimately manufactured drug." R. Doc. 209, at 30. In support of the enhancement, the district court first noted that although it did not know who packaged the drugs found in Salinas's backpack, they were found in "*his* backpack. And *he* put the backpack in the car." *Id.* at 26 (emphases added). According to the court, "the chances are very good that these fentanyl pills were part of the conspiracy that [Salinas] was convicted of." *Id.*; *see also id.* at 27 ("We don't know what he had to do with packaging these drugs. We know that he obviously put them in his backpack. It wasn't somebody else's backpack. It was his, and he put them in the car.").

Second, the court explained that Salinas was not a "typical mule"; according to the court, "[t]he typical mule will pick up usually a vehicle loaded with drugs at some location so he doesn't know. . . who the person was who gave him the drugs." *Id.* at 26. Additionally, the "typical mule" will "drop [the vehicle] at some other remote location at the point of delivery, and somebody picks it up." *Id.* By contrast, the court found that Salinas

> knew a lot more than that. He had to have known what the price was. Obviously, he was going to get paid in Minneapolis or on Sisseton or both. So he would have to know what the prices were, what he was going to receive from the buyers or buyer, exactly where to meet the buyer or buyers with personal contact. There is no evidence that he was just going to drop off this vehicle. If he was going to do that, they wouldn't be using Ms. Gonzales's vehicle when she apparently intended to return to California.

*Id.* at 26–27. Salinas was directing Gonzales "where to drive. She testified to that." *Id.* at 27.

Also in support of its willful-blindness finding, the court cited testimony from trial that Salinas possessed two cell phones and "was receiving a lot of calls . . . when he was in custody using these cell phones, or at least one of them." *Id.* at 13. "[A]ll of these cell phones, all of these contacts" indicated to the district court that "Salinas was far more than a mule." *Id.* at 27. He "was in rather constant contact with another person throughout the trip"; the evidence showed "that this contact belonged to a known drug dealer in California." *Id.* at 34. During the month preceding the trip, Salinas had "21 incoming and outgoing calls" with an associate of "Salinas's boss," a known participant in "a drug trafficking organization." *Id.* at 34–35. The court noted that "[p]eople who are only mules do not have bosses. They are more or less independent contractors who are kept in the dark as much as possible." *Id.* at 35.

The district court also added a role enhancement of two-levels to Salinas's offense level for being "an organizer, leader, manager, or supervisor" of Gonzales. *Id.* at 33; *see also* U.S.S.G. § 3B1.1(c). Coupled with that enhancement, the district court added two additional levels for Salinas's aggravating role in using his friendship with Gonzales to get her to transport the drugs. *See* U.S.S.G. § 2D1.1(b)(16)(A) ("If the defendant receives an adjustment under § 3B1.1 (Aggravating Role) and . . . (i) [t]he defendant used . . . friendship . . . to involve another individual in the illegal . . . transport . . . of controlled substances, (ii) the individual received little or no compensation from the illegal . . . transport . . . of controlled substances, and (iii) the individual had minimal knowledge of the scope and structure of the enterprise . . . increase by 2 levels.").

After applying all the enhancements, the district court calculated a total offense level of 40. An offense level of 40, coupled with a criminal history category of I, resulted in a Guidelines range of 292 to 365 months' imprisonment.

Throughout the sentencing hearing, the district court expressed its concern about Salinas's arrest with the fentanyl on the Lake Traverse Reservation. *See* R. Doc. 209, at 6, 13, 36–37, 39. During a portion of the government's argument, the court interjected that no evidence existed that "all of th[e] fentanyl was going to Minneapolis." *Id.* at 6. The court observed that Salinas was arrested "on the reservation, where fentanyl is out of control, where Mexican drug lords are operating—have been operating for many months, we know, because [the court] ha[s] had most of those cases, of course." *Id.* According to the court, "[N]obody would be on the Sisseton-Wahpeton Indian Reservation in a remote area if you are, in fact, intending to go straight to Minneapolis." *Id.* The court characterized the case as one of the "biggest drug bust[s] in the history of South Dakota." *Id.*

-5-

Before hearing argument from Salinas's counsel, the court commented that "[i]t's unquestionable[] [Salinas] was on the Sisseton-Wahpeton Indian Reservation. That by no stretch of the imagination is on the way to Minneapolis, any more than being in North Dakota would be." *Id.* at 13. The court found it "reprehensible that [Salinas was] on the reservation with this amount of . . . fentanyl." *Id.*

In imposing Salinas's sentence, the court referenced its repeated statement over "many years" that

> the last thing we need on the reservations in South Dakota is drugs. We have tremendous problems with alcohol. We have tremendous problems with inadequate health care, inadequate funding for many things that the tribes need, lack of employment for the most part, and substandard housing, tremendous instances of sexual abuse of children and of women, for that matter. Women and children are at great risk on our reservations, and I've seen thousands of cases like that.
>
> And so when you add in the terrible effects from fentanyl and methamphetamine and cocaine, for that matter, it compounds and worsens the living conditions faced by our Native American brothers and sisters.

*Id.* at 24. According to the court, "the most reprehensible part of this case" was that Salinas was "on the Sisseton-Wahpeton Indian Reservation with an enormous quantity of fentanyl, where . . . the evidence was that it brings . . . [$]35 to $40 a pill." *Id.*

The court stated that "[n]o GPS would ever take you through the Sisseton-Wahpeton Indian Reservation on the way to Minneapolis." *Id.* As a result, the court concluded that "something is going on here with these defendants. In fact, [the court] th[ought] one of them made the statement to the officer that they were

looking for a house there." *Id.* The court did not find this "surprising" because "Mexican drug cartels are in South Dakota big time." *Id.* at 24–25.

The court recounted evidence from an unrelated trial in which "drug dealers in the Sisseton-Wahpeton Reservation were frightened" after being shown "videos made by one Mexican drug cartel showing a person being dismembered. Hand, elbow, shoulder, then the other hand, then the legs, until the person[] finally died." *Id.* at 25. Another video showed a person being burned to death: "Set him on fire and made a video of it. And, of course, he died." *Id.* The videos' purpose was to frighten the reservation drug dealers "to keep them selling drugs at a high level. Big quantities." *Id.*

The court noted the "tremendous amount of fentanyl[] [that] has been[] on that reservation, and a tremendous amount of fentanyl dealers." *Id.* The court questioned Salinas's and Gonzales's presence "in the middle of nowhere where . . . . drug conspiracies [are] going on" and the drug trade is flourishing. *Id.* The court commented that "[i]t's almost a racial crime to be dropping drugs like that off on our reservations. And if [Salinas and Gonzales] weren't [on the reservation] for that purpose, tell me what the purpose was. That they're lost?" *Id.*

In short, the court concluded that, given the availability of preferable routes to Minnesota, Salinas entered the reservation specifically to distribute fentanyl. The court then discussed the price of fentanyl on the Lake Traverse Reservation in comparison to locations such as Minneapolis and the dangers of fentanyl in general and specifically on the reservation. The court cited various statistics from the Centers for Disease Control in support of its conclusion.

The court recognized its obligation to "take into account not only the federal sentencing guidelines but also all of the statutory factors set forth in 18 United States Code Section 3553" and stated that it was "doing so." *Id.* at 36. According to the court,

> *the most significant part of this case was the fact that [Salinas was on] . . . the Sisseton-Wahpeton Indian Reservation with an enormous quantity of fentanyl*, which has caused deaths and all kinds of drug problems for people that live there. So he is not just wandering through this reservation. Now, of course, there is no direct proof of that because Ms. Gonzales didn't know where they were going. She went where he told her to go. And if you believe that, then he obviously told her to drive on the Sisseton-Wahpeton Indian Reservation.
>
> It's like hauling bombs in there. Any kind of drug that people are bringing onto these reservations is like bringing bombs, explosive materials. And fentanyl, as we know, is the worst by far. And we know because that's where these cases are coming from. I thought methamphetamine was bad.

*Id.* at 36–37 (emphasis added).

The court overruled Salinas's motion for a downward departure or variance, stating, "If anything, he's entitled to an upward departure or an upward variance." *Id.* at 38. The court then imposed a sentence of life imprisonment, stating that such sentence was "the appropriate sentence" "[w]hether [the court was] sentencing within the guidelines or based on the statutory factors, which [the court] ha[d] gone through in great detail." *Id.*

When defense counsel clarified that Salinas's total offense level was 40, resulting in a Guidelines range of 292 to 365 months' imprisonment, the court responded that it was "nevertheless imposing an upward variance, then, of life, based primarily . . . on what they were doing on the Sisseton-Wahpeton Indian Reservation

with this amount of drugs." *Id.* at 39. Defense counsel then objected to the life sentence, and the district court overruled the objection.

In its Statement of Reasons, the district court gave the following sentencing rationale:

> The Court noted the defendant was not a typical drug mule. The defendant was associated with individuals involved in a drug trafficking organization. He recruited the codefendant to drive him from California to Minneapolis, MN, and instructed her where to drive to. For unknown reasons, they drove from California to Spearfish, SD, and were ultimately stopped by law enforcement on the Lake Traverse Reservation in South Dakota. Neither Spearfish nor the Lake Traverse Reservation are on the way to Minneapolis from Los Angeles, CA. For that reason, the Court believes a portion of the fentanyl that was being transported was intended to be distributed on the Lake Traverse Reservation, where the fentanyl pills sell for $40 to $50 per pill rather than a significantly lower street value in Minneapolis. Given the amount of fentanyl powder and counterfeit M30 fentanyl pills the defendant was transporting, it could have resulted in the deaths of numerous individuals. Based on the facts of the case and the danger to others, the Court imposed an upward variance and sentenced the defendant to life imprisonment.

R. Doc. 197-1, at 4.

## II. *Discussion*

On appeal, Salinas challenges his life sentence. He argues that the district court procedurally erred in applying a two-level enhancement under U.S.S.G. § 2D1.1(b)(13) and varying upward to a life sentence. He also maintains that his life sentence is substantively unreasonable.

"Regardless of whether the sentence imposed is inside or outside the Guidelines range," we "review the sentence under an abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 51 (2007). "We proceed in two steps when reviewing a sentence. We first review for procedural error, and then, if there is none, we consider the substantive reasonableness of the sentence imposed." *United States v. Still*, 6 F.4th 812, 817 (8th Cir. 2021). "[S]ignificant procedural error" includes "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall*, 552 U.S. at 51.

## A. *U.S.S.G. § 2D1.1(b)(13)*

Salinas first argues that the district court procedurally erred by applying a two-level enhancement for marketing or representing pills containing fentanyl as oxycodone pills. *See* U.S.S.G. § 2D1.1(b)(13). Salinas asserts that no evidence exists that he "represented or marketed the fentanyl pills as oxycodone" and "nothing in the record establish[es] [that he] knew the backpack contained fentanyl let alone that there were pills marked M-30." Appellant's Br. at 11. Salinas's argument fails, and we affirm the district court's application of the enhancement under § 2D1.1(b)(13).

Section 2D1.1(b)(13) provides:

> If the defendant . . . represented or marketed as a legitimately manufactured drug another mixture or substance containing fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide) or a fentanyl analogue, *and acted with willful blindness or conscious avoidance of knowledge that such mixture or substance was not the legitimately manufactured drug*, increase by 2 levels. The term "drug," as used in subsection (b)(13)(B), has the meaning given that term in 21 U.S.C. 321(g)(1).

(Emphasis added.)

The district court did not err in applying the willful blindness doctrine in this case. "[W]illful blindness . . . is one way in which a [fact finder] can permissibly find that a defendant acted knowingly." *United States v. Fletcher*, 946 F.3d 402, 408 (8th Cir. 2019) (internal quotation marks omitted). "The willful blindness doctrine has been widely accepted in criminal law for many decades." *Tantchev v. Garland*, 46 F.4th 431, 437 (6th Cir. 2022). Willful blindness "goes by many names, including conscious-avoidance and . . . deliberate ignorance." *Id.* (cleaned up). "[A] willfully blind defendant is one who . . . can almost be said to have actually known the critical facts." *United States v. Sharp*, 879 F.3d 327, 335 (8th Cir. 2018) (alteration in original) (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)); *see also Tantchev*, 46 F.4th at 437 ("Some circuits . . . have said that willful blindness is as culpable, and therefore interchangeable, with a *mens rea* of knowledge."). "[W]illful blindness . . . is a mechanism for inference, not a substitute for knowledge." *United States v. Galimah*, 758 F.3d 928, 931 (8th Cir. 2014) (internal quotation marks omitted). Willful blindness has

> two basic requirements: (1) The defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact. We think these requirements give willful blindness an appropriately limited scope that surpasses recklessness and negligence.

*Global-Tech Appliances, Inc.*, 563 U.S. at 769 (footnote omitted).

In this case, the district court concluded that "there is enough evidence here for willful blindness to apply, or conscious avoidance of knowledge, that such mixture or substance was not the legitimately manufactured drug." R. Doc. 209, at 30. Specifically, the court observed that "there was evidence at trial that was sufficient" "to prove that the enhancement . . . should apply." *Id.* at 31. We agree. The facts cited by the district court demonstrate that (1) Salinas subjectively believed that a high probability existed that the fentanyl in his possession was not oxycodone, and (2)

-11-

Salinas acted to avoid confirming that fact. The trial evidence showed that Salinas was not a "typical mule" who merely picked up a vehicle filled with drugs without knowing the source of the drugs and then dropped the vehicle off at a remote location for someone else to pick up. *Id.* at 26. Instead, Salinas had Gonzales drive her car and directed Gonzales where to drive. Gonzales picked up Salinas at his Sylmar, California residence to start the trip; at that time, Salinas was carrying a backpack, the contents of which he never disclosed to Gonzales. Salinas's backpack remained under his sole custody and control. The M-30 fentanyl pills resembling oxycodone were found in "*his* backpack. And *he* put the backpack in the car." *Id.* (emphases added). Following their arrest, while being transported to a court proceeding, Gonzales asked Salinas "why he was doing this to [her], why he was saying that a backpack was [Gonzales's] when it wasn't." R. Doc. 206-1, at 68–69. Salinas responded in a threatening manner, admonishing her that she "should have never pointed that backpack towards [him]." *Id.* at 69.

Salinas's boss was "associated with a drug trafficking organization." R. Doc. 209, at 34. Salinas's boss had been present at Salinas's residence when Gonzales arrived to pick up Salinas. Salinas stayed in "constant contact" via his mobile phones with a person tied to drug trafficking throughout the trip. *Id.* At trial, Special Agent Frank Feden testified that the manner in which Salinas possessed the 16 pounds of fentanyl showed that he was a "well trusted" distributor given the quantity and its transport in an "unlocked backpack" as opposed to locked suitcase or "stuffed in the car." R. Doc. 206-1, at 126. Additionally, the quantity that Salinas possessed, the packages' markings, and the manner of wrapping demonstrated an intention to distribute to different customers. Ten of the packages contained approximately "5,000 pills per package," and each pill was made to look like the "most popular generic oxycodone 30 milligrams sold in the United States." *Id.* at 135–36. Specifically, the markings denoted "the label of the manufacturer of the domestic pharmacy company here in the United States." *Id.* at 136–37. The disguised fentanyl led customers to believe that the drugs were "safe" because they were "made in the United States and

-12-

made by a pharmaceutical . . . . [It was] a way to sell to younger and younger customers because they think they're taking medicine and not a street drug." *Id.* at 137.

Finally, the jury concluded that Salinas knew about the controlled substance in his possession. It convicted him of both offenses alleged in the charging document. *See* R. Doc. 164. The jury's knowledge finding further supports the district court's application of § 2D1.1(b)(13) because the government was required to prove beyond a reasonable doubt that Salinas "voluntarily and intentionally possessed" fentanyl and that he "knew that he was in possession of fentanyl." R. Doc. 161, at 16 (Final Jury Instructions).

## B. *Upward Variance*

Salinas's Guidelines range was 292 to 365 months' imprisonment. The district court imposed an upward variance to a term of life imprisonment. Salinas argues that the district court procedurally erred by varying upward "based on clearly erroneous facts unsupported by the record." Appellant's Br. at 12. Specifically, he claims that the district court "applied an upward variance based solely on the fact that [he] was found on an Indian Reservation" and speculation "that some portion of the fentanyl was destined to be distributed on the Reservation." *Id.* at 15. According to Salinas, law enforcement's investigation showed that "the fentanyl was destined for Bloomington, Minnesota," not the reservation. *Id.* He maintains that "[i]t was a significant procedural error for the [d]istrict [c]ourt to speculate any portion of the drugs was intended to be sold on the Indian Reservation when the facts presented at trial do not support that conclusion." *Id.* at 16.

The district court commented that it considered Salinas's presence on the Sisseton-Wahpeton Indian Reservation with an enormous quantity of fentanyl the "most significant part of this case." R. Doc. 209 at 36–37. The court noted that fentanyl "has caused deaths and all kinds of drug problems for people that live there."

*Id.* at 37. The district court stated it imposed the upward variance "based primarily . . . on what [Salinas and Gonzales] were doing on the Sisseton-Wahpeton Indian Reservation with this amount of drugs." *Id.* at 39.

In its Statement of Reasons, the district court acknowledged that it was "unknown" why Salinas and Gonzales "drove from California to Spearfish, [South Dakota,]" and then to the "Lake Traverse Reservation." R. Doc. 197-1, at 4. The court noted that "[n]either Spearfish nor the Lake Traverse Reservation are on the way to Minneapolis from Los Angeles, [California]." *Id.* "For that reason," the court found that "a portion of the fentanyl that was being transported was intended to be distributed on the Lake Traverse Reservation, where the fentanyl pills sell for $40 to $50 per pill rather than a significantly lower street value in Minneapolis." *Id.*

Our query is whether evidence presented at trial supports the district court's factual finding at sentencing that Salinas intended to distribute the fentanyl *on the Lake Traverse Reservation*. *See United States v. Harrell*, 982 F.3d 1137, 1140 (8th Cir. 2020) ("In selecting a sentence, a district court may rely on undisputed factual allegations in the Presentence Investigative Report (PSR), reliable evidence introduced by the parties, and, to some extent, its own judicial experience. However, sentencing courts may not engage in speculation or draw inferences unsupported by the record." (citations omitted)). We conclude that sufficient evidence is lacking to support the court's fact finding.

It is undisputed that authorities stopped Gonzales's vehicle in which Salinas was a passenger on the reservation. But presence alone does not establish that Salinas intended to distribute the fentanyl seized on the reservation. Salinas told law enforcement that he and Gonzales "were going to see family in Minnesota." R. Doc. 206, at 60. At trial, Gonzales testified that Salinas "told [her] Minnesota" was the destination, although he never provided her with an address. R. Doc. 206-1, at 59; *see also id.* at 63 ("Q[.] . . . So you were going to drive straight from California to

-14-

Minnesota at the end of November, drop off Edwin [Salinas], and return immediately to California? A[.] Yes.").

At trial, the government had offered testimony and exhibits regarding Salinas's travel plans that law enforcement discovered on one of the phones seized. Government Exhibit 64 was "searches for travel, recent searches" discovered on Salinas's phone. *Id.* at 19. It revealed searches for "Mall of America in Bloomington, Minnesota." *Id.* Government's Exhibit 65 showed "travel plans. One of the places look[ed] like to be Mall of America." *Id.* There were "two icons on this map." *Id.* "[T]he first icon" was "California." *Id.* The second icon was "Minnesota." *Id.* at 20.

Government Exhibit 74 showed that the "next visited location" after stopping in Casper, Wyoming, was "a Loaf N' Jug gas station in Spearfish, South Dakota." *Id.* at 23. Gonzales testified that she and Salinas "stop[ped] in Spearfish, South Dakota, for gas and snacks." *Id.* at 57. A receipt confirmed that stop. After stopping at a gas station in Gettysburg, South Dakota, "the next significant place" that Salinas stopped was "a Cenex gas station in Summit, South Dakota." *Id.* at 24. Thereafter, the next area visited was "the Sisseton area." *Id.* This is where Salinas was stopped by law enforcement.

Agent Feden testified about the street value of the fentanyl recovered from Salinas in both South Dakota and Minnesota. He stated:

> For an individual pill—and once again, every market is different; every city is different. Like, if you're asking for Northeast South Dakota, a pill goes for 40 or $50, roughly. *On the reservations, it could go higher*. So at 40 or $50 at 49,000 pills, you're looking at between 1.9 and $2.4 million. But those same pills wouldn't be that—wouldn't be worth that much selling individually in another market. For example, in Minneapolis, a pill goes for 2 to 4 bucks—or 2 to $4 a pill. So it would only be, you know, 100,000 to $200,000.

*Id.* at 128–29. According to Agent Feden, "there was . . . a little over 49,000 [pills]." *Id.* at 129. Calculating the pills at $40 per pill, 49,000 pills multiplied by $40 totaled "$1,960,000." *Id.*

Agent Feden testified that "a transaction unit for fentanyl powder" is "a tenth of a gram or what the street slang is called 'point.'" *Id.* at 130. When asked how much money a tenth of a gram costs, Agent Feden replied, "[Y]ou don't typically see fentanyl being sold in powder in South Dakota." *Id.* But "[i]n Omaha and Sioux City, a point or a tenth of a gram goes for about $25 a gram—or a point. And then in Minneapolis, it goes for 3 to $5 a point." *Id.* "For the Omaha area," the approximate value of the powder was "$327,000. For the Minneapolis area, a lot less, probably around 44,000 to $72,000." *Id.* at 131.

In summary, although the government offered testimony about where the traffic stop occurred and how much the fentanyl would have sold for "on the reservations," *id.* at 129, it never offered evidence that the fentanyl in Salinas's possession was intended for *distribution* on the Lake Traverse Reservation. Instead, the testimony and documentary evidence showed only that Minnesota was the ultimate destination. Even the government concedes that the district court "*surmised* that a portion of the controlled substances was intended for distribution on the reservation, where the prices and street value for fentanyl pills are much higher than Minneapolis." Appellee's Br. at 14 (emphasis added). "Surmise" means "[t]o infer (something) without sufficient evidence. To make a conjecture; guess." Appellant's Reply Br. at 6 (quoting American Heritage Dictionary 1366 (3d ed. 1993)). Furthermore, the district court acknowledged the absence of evidence as to *why* Salinas was on the reservation. *See, e.g.*, R. Doc. 209, at 6 ("Who says all of this fentanyl was going to Minneapolis? Nobody. He's on the reservation, where fentanyl is out of control . . . ."); *id.* at 25 ("And if they weren't there for that purpose, tell me what the purpose was. That they're lost? I don't think so."); R. Doc. 197-1, at 4 ("*For unknown reasons*, they drove from California to Spearfish, SD, and were ultimately stopped by

law enforcement on the Lake Traverse Reservation in South Dakota." (emphasis added)). As a result, the district court clearly erred—and thus procedurally erred—in finding at sentencing that Salinas intended to distribute the fentanyl on the Lake Traverse Reservation.

This error was not harmless. *See United States v. Wise*, 17 F.4th 785, 789 (8th Cir. 2021) ("An error is harmless only if we are convinced that the error did not affect the district court's sentencing conclusion." (internal quotation marks omitted)). Here, although the district court stated that a sentence of life imprisonment was "the appropriate sentence" "[w]hether [the court was] sentencing within the guidelines or based on the statutory factors," R. Doc. 209, at 38, we cannot determine on this record whether the court's clearly erroneous fact finding was essential in applying an upward variance.[1]

## III. *Conclusion*

We hold that the district court properly applied the U.S.S.G. § 2D1.1(b)(13) two-level enhancement but procedurally erred in selecting a life sentence based on clearly erroneous facts—Salinas's unproven intention to distribute drugs on the Lake Traverse Reservation of the Sisseton-Wahpeton Oyate Sioux Tribe. Accordingly, we vacate Salinas's life sentence and remand for resentencing.

_____

---

[1]Because we hold that the district court procedurally erred, we need not reach Salinas's argument that his sentence is also substantively unreasonable. *See Still*, 6 F.4th at 817.